**FILED**
JUN - 9 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLOMBIA

HADI MEHRSEFAT

6200 WESTCHESTER PARK DR., APT. #815

COLLEGE PARK, MD, 20740

TELEPHONE N0. (301) 345- 0478

CASE NUMBER   1:06CV01060

JUDGE: Henry H. Kennedy

DECK TYPE: Employment Discrimination

DATE STAMP: 06/09/2006

VS.                    CIVIL ACTION NO.


DIRK KEMPTHORNE

SECRETARY, U.S. DEPARTMENT OF INTERIOR

1849 C STREET, NW

WASHINGTON, DC, 20240


RUTH ELLEN STOKES,

CHIEF, OFFICE OF PLANNING, ANALYSIS AND BUDGET

OFFICE OF SURFACE MINING, US DEPARTMENT OF INTERIOR

1951 CONSTITUTION AVE, N.W.

WASHINGTON, DC, 20240

NANCY ROBERTSON BRODERICK

Sr. ECONOMIST, OFFICE OF SURFACE MINING

1951 CONSTITUTION AVE, N.W.

WASHINGTON, DC, 20240

ROLAND GOODMAN

INVESTIGATOR, SOUTHWIND

1804 N. GEORGE MASON DRIVE

ARLINGTON, VA, 22205

## COMPLAINT

HONORABLE US DISTRICT COURT FOR THE DISTRICT OF COLOMBIA: this complaint is duly filed pursuant to exercise of my "right to file a civil action in an appropriate United States District Court within ninety calendar days from the date" of the receipt of the Equal Employment Opportunity Commission (EEOC) "decision"[1] on my appeal of the US Department of Interior's final agency decision (FAD) concerning my complaint of unlawful *employment discrimination* and denial of *due process*.

United States Department of Interior (hereinafter, the Agency) engaged in unlawful *employment discrimination* against me in violation of the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C., 621 *et seq.*, and denied me *due process* in its investigation of my employment discrimination complaint. I filed a

---

[1] See Exhibit 1, EEOC "Decision" on Appeal No. 01455903, dated March 3, 2006, that was received on March 11, 2006.

2

timely appeal with the EEOC concerning the *employment discrimination* and the denial of *due process*.[2] In its "decision", EEOC has given no weight to the evidence substantiating the age *discrimination claim* while refusing to acknowledge and/or address the denial of *due process* claim. I humbly request that the court examine the evidence concerning the age *discrimination in employment* and the denial of *due process* and order the Agency to make me whole.

FACTUAL BACKGROUND

1.  I am a 58-years old American citizen of Iranian origin. I hold BA and MA degrees in economics and finance from accredited institutions of higher learning. I have job experience in private and public sectors. Since 1998, I have been teaching economics and finance courses in accredited universities in the Washington Metropolitan area.[3]

2.  In April 2004, the Agency announced vacancy for an Economist position (position no. GS-0110-05/07, announcement no. OSM-2004-0049, opening from 04/30/04 to 06/01/04).[4] The Vacancy Announcement states that Economist GS-5 or GS-7) incumbents as "... *trainee*, ... will work directly with senior economist and analyst assisting in initiating, formulating...." (*italics* added)[5]. While the Vacancy Announcement did not distinguish between the duties of the GS-5 and GS-7 positions, the Position Descriptions did[6]. Not surprisingly, the duties of and skills required for performance at the GS-5 level were less demanding than those of the GS-7 level. For

---

[2] See Exhibit 2, Statement of Appeal to EEOC, Office of Federal Operation, dated October 3, 2005.
[3] See Exhibit 3, titled "Personal Data". This exhibit appears as Exhibit 16 in the Agency's Report of Investigation of the Complaint of Discrimination Filed by Hadi Mehrsefat, LSM-05-02, hereinafter referred to as the ROI.
[4] See Exhibit 4. This exhibit appeared as exhibit 8 in the ROI.
[5] Op. cit, page 1.
[6] Compare Exhibit 5 and Exhibit 6. They are copies of Exhibits 9 and 10 in the ROI

instance, the GS-7 economist is expected to "Coordinate data gathering and statistical validation activities...", while the GS-5 economist is merely expected to "[A]ssist in data gathering and statistical validation activities...."[7] The computing and programming skills required for the GS-5 position is specified as an"...Ability to prepare spreadsheets and use various computer software such as Word, Access, Excel, PowerPoint, etc."[8]

3.  I was qualified for both positions, but to be on the safe side applied for the lower-level position (i.e., for Economist, GS-5 position)

4.  In early June 2004, sixty applicants were found eligible for the GS-5 position.[9] Based on the applications, the "Screening Sheet" automatically scored and ranked the 60 applicants on the basis of how bests their qualifications matched those required for the position. I had the highest score (97.48) and was ranked first among the applicants. The "Screening Sheet" automatically screened out all but nine applicants with highest score.[10]

5.  The hand written notations on the "Screening Sheet" are noteworthy. Someone writes the "cut-off score" at 95:00, thereby limiting the candidates to five. The five candidates' educational attainments are scribed next to their names. There are additional notations next to my name and that of the Selectee (James Tichenor). Written next to my name is: "*BS/Economics? Diploma Mills, MS/Finance*). Next to Mr. Tichenor's name is written "BS/Economics & Math, GPA 3.73". A quick check of Mr. Tichenor transcripts indicates that his GPA was 3.169, much lower than 3.73.[11] In other words, the hand

---

[7] Compare 4th bullet in page 3 of Exhibit 5 with the 4th bullet in page 3 of Exhibit 6.

[8] See pages 3-4 in Exhibits 5 and 6.

[9] See pages 1-5 of Exhibit 7, entitled "Screening Sheet –Staging Area Applicant Listing, Office of Surface Mining 0110 Economist GS-0110-05/07". This exhibit corresponds to Exhibit 14 in ROI.

[10] See page 1 of Exhibit 7.

[11] See page 10 of Exhibit 8, entitled "Personal Data – Tichner, James". This exhibit corresponds top Exhibit 17 of the ROI.

written notes deliberately exaggerate Mr. Tichnor's GPA, while casting doubts on my academic credentials.

6.  Records indicate that five applicants were found eligible for the GS-5 level position in the "Certificate of Eligibles -- NO. OSM-2004—0049" that was issued on 06/23/04.[12] The five eligible candidates and their scores were: (1) Mehrsefat, Hadi with the score of 97.48; (2) Brigida, Mathew, with the score of 96.72; (3) Hibshman, Jonathan with the score of 96.34; (4) Tichenor, James, with the score of 96.34; and (5) Pierce, Ajani with the score of 95.08.[13] The "INSTRUCTION FOR Delegated Examining Unit (DEU) Certificates" states, among other things, that *"If there are more than three names in the certificate, you must select from the first three available names before considering subsequent names"*.[14]

7.  In the "List of Eligibles" sheet, next to names of the first four candidates, dates scribed are: 7/9/04; 7/8/04; 7/8/04; and 7/29/04.[15] These dates refer to the dates that interviews were conducted with the first four eligibles. In the first column, hand written notes specify (C/N) next to the 1st, 3rd, and 5th eligibles, and (A) -- indicating selected or appointed -- next to 2nd and 4th eligibles.[16] In that column, next to the 4th eligible, is written "accepted offer 8/17/04".[17] In the last column of the sheet, in the second row says that "The selectee declined offer 7/28/04", and in the 4th row says "effective 8/22/04".[18]

8.  These records indicate that the three highest scoring candidates were interviewed, 1st and 3rd highest scoring candidates were deemed (C/N) (i.e, Candidate/Not qualified?!),

---

[12] See page 1 of Exhibit 9. This exhibit corresponds to Exhibit 15 of the ROI.
[13] *Op.cit.*
[14] See page 2 of Exhibit 9.
[15] *Op. cit.*
[16] *Op. cit.*
[17] *Op.cit.*
[18] *Op.cit.*

the 2nd highest scoring candidate was offered the job. Once the second highest scoring candidate declined the job, contrary to the "INSTRUCTION FOR DEU"[19], the 4th highest scoring candidate (i.e., Mr. Tichnor) was quickly interviewed and offered the job.

9. Records indicate that aside from this appellant, the remaining four eligibles were in their mid-twenties. Records also indicate that aside from this complainant, the remaining four eligibles were all US-born citizens.

10. After I was notified of my non-selection, I complained to an EEO Counselor in mid-October 2004. Failing to receive a meaningful consideration of my complaint from the EEO counselor, I filed a formal complaint of discrimination on 11/19/04. The Agency acknowledged receipt of my complaint, and appointed a Mr. Roland Goodman, of SOUTHWIND, to investigate my complaint on 01/21/05. Mr. Goodman issued his Report Of Investigation (ROI) on June 8th, 2005.

11. Exhibit 10, titled "Organization Relationship of Witnesses", is a copy of Exhibit 4 in Mr. Goodman's ROI. It identifies two witnesses of the Agency: Ms. Ruth Stokes and Ms. Nancy Broderick.

12. Exhibit 11 is the "Affidavit" that I signed and dated on March 15, 2005, at Mr. Goodman's presence. This Affidavit appeared as Exhibit 5 in the ROI.

13. In late March 2005, Mr. Goodman showed me, but refused to give me a copy of Ms. Stokes' "Notes from Interviews". The "Notes" that I was shown in late March 2005 may or may not have been identical to those attached to a covering note, dated April 15, 2005, from Ms. Stokes to Mr. Goodman, titled "RE: Notes from Interviews for GS-5

---

[19] See page 2 of Exhibit 9.

6

Economist Position". Ms. Stokes covering note of April 15, 2005 that appeared as Exhibit 6.1 of the ROI is attached to this Complaint as Exhibit 12.

14. Also in late March 2005, Mr. Goodman supplied me with copies of Ms. Stokes and Ms. Broderick's affidavits and asked me to prepare comments or rejoinders on them. Copies of those affidavits are attached to this Complaint as Exhibits 13 and 14.

15. Pursuant to his instructions of late March 2005, on April 4, 2004, I submitted to Mr. Goodman two-page comments on Ms. Stokes' and Ms. Broderick's affidavits, entitled "Rejoinder". A copy of the "Rejoinder" is attached this Complaint as Exhibit 15.

16. On April 6, 2005, Mr. Goodman asked me to review and sign a note, entitled "Addendum" as a substitute for the "Rejoinder". I reviewed the "Addendum" and found that it aligned with but less focused that the "Rejoinder". In particular, while the "Rejoinder" made direct quotes from Ms. Stokes' and Broderick's affidavits, the "Addendum" did not. Nevertheless, trusting the integrity of the investigative process, I signed the "Addendum" on April 8, 2005. The "Addendum" is attached to this Complaint as Exhibit 16.

17. On April 15th, 2005, Mr. Goodman informed me that (i) Ms. Stokes has *revised*, signed and dated her affidavit[20] on April 14th, 2005, that (ii) Ms. Broderick signed her affidavit[21] on April 14th, 2005, but dated it March 24th. He wanted me to review the newly revised affidavits and change my "Addendum" to be consistent with the revised affidavits. I found that Ms. Stokes had revised parts of her "Affidavit" that were supportive of my claim of unlawful employment discrimination. There were not – are

---

[20] See Exhibit 17 for Ms. Stokes "Affidavit". This Affidavit is signed and dated April 14., 2005.
[21] See Exhibit 18 for Ms. Broderick "Affidavit". This "Affidavit" is signed on April 14, 2005, but is dated March 24, 2005

not – any doubt in my mind that Ms. Stokes changed her "Affidavit" after Mr. Goodman presented her with my "Rejoinder" of April 4, 2005, and "Addendum" of April 8th, 2005. I objected to Mr. Goodman showing my "Rejoinder" and "Addendum" to Ms. Stokes and Ms. Broderick and allowing them to revise their affidavits. Mr. Goodman withdrew his request that I revise my "Addendum", and informed that he was going to finalize his ROI based on Ms. Stokes' revised "Affidavit" and my unrevised "Addendum".

17. On April 19, 2005, through an email addressed to Mr. Goodman, I recorded the sequence of events and reiterated the flaws in the investigative process as I saw them at the time. The email is Exhibit 19 attached to this Complaint.

18. On June 8th, 2005, Mr. Goodman filed his Report of the Investigation (ROI). The ROI did *not include*: (i) my email of April 19, 2005, addressed to Mr. Goodman; (ii) Ms. Stokes' "Affidavit"[22] that I was supplied in late March, 2005, and asked to comment on; (iii) Ms. Broderick's "Affidavit"[23] that I was supplied in late March 2005, and asked to comment on; and (iii) my "Rejoinder"[24] of April 8th, 2005. On the other hand, the voluminous ROI contained great many documents that were at best tangentially related to my complaint.

19. On June 27th, 2005, in a letter addressed to the Agency, I drew the Agency's attention to "egregious flaws" in the investigative process and the ROI, and requested a final agency decision (FAD) on my complaint. The letter is attached to this Complaint as Exhibit 20.

20. On August 8, 2005, the Agency issued its final administrative decision (FAD) on my complaint. The Agency's FAD and its covering letter is attached to this Complaint as

---

[22] See Exhibit 13.
[23] See Exhibit 14..
[24] See Exhibit 15.

Exhibit 21. The Agency denied my claim of employment discrimination. And, as for my report of "egregious flaws" in the investigative process and the ROI, the Agency refused to acknowledge, deny, or address the flaws.

21.     On September 7, 2005, I filed an appeal with the Equal Employment Opportunity Commission (EEOC) regarding the Agency's FAD and its refusal to acknowledge and address my claim of irregularities in the investigative process. The EEOC acknowledgement of my appeal is attached to this Complaint as Exhibit 22.

22.     On October 5, 2005, I submitted an 18-page "Statement of Appeal" with the EEOC. A copy of the "Statement of Appeal" is attached to this Complaint as Exhibit 2.

23.     On March 8, 2005, I received the Commission's DECISION[25] (hereinafter, the "Decision") on Appeal No. 01A55903. The "Decision" summarily repeats the Agency's presentation of my claim of discrimination, the Agency's denial of discrimination, and "finds" that the Agency's actions were not "a pretext for discrimination". The "Decision" does not acknowledge or address my claim of denial-of-due-process caused by irregularities in the investigation.

DISCUSSION AND ANALYSIS

24.     Records indicate that I was one of five applicants identified in the "List of Eligibles"[26] for interviews to fill a single, entry-level, Economist GS-5 position. They also indicate that I was twice as old as any one of other eligible applicants, and that I scored highest among the eligible applicants based on matching of qualifications and position requirements. They further show that the Agency conducted interviews with the

---

[25] See Exhibit 1.
[26] See page 3 of Exhibit 9.

9

first three of the five eligible applicants, offered the job to the 2nd highest scoring eligible who declined the offer, and then proceeded to interview and offer the job to the fourth eligible applicant (i.e., to Mr. Tichenor). The records also indicate that pursuant to my complaint of employment discrimination, the Agency appointed Roland Goodman of SOUTHWIND to investigate my complaint[27]. Finally, the records indicate that I objected[28] to Mr. Goodman regarding irregularities in his investigation prior to his issuance of the ROI; reported the investigative irregularities to the Agency[29] prior to its issuance of FAD; and claimed that the investigative irregularities amounted to denial of due process in my appeal[30] to the EEOC. By contrast, there is *no evidence* of Mr. Goodman denying my claim of investigative irregularities or inclusion of my objection to the irregularities in his ROI; there is *no Agency*[31] *acknowledgment or denial* of my report of the investigative irregularities; and there is *no indication* in the EEOC "Decision"[32] that the Commission did in fact consider my claim of denial of due process because of the investigative irregularities.

24.   Given the facts on record, the court is requested to ascertain first and foremost the nature of the investigative irregularities, then rule as to whether or not the irregularities amounted to a denial of due process, before proceeding to assess whether the refusal by the Agency and the EEOC to acknowledge and address my reports of the irregularities accentuated or mitigated denial of due process at the investigative phase.

25.   *What were the investigative sequence and irregularities?*

---

[27] See paragraph 10 above and Exhibit 10.
[28] See Exhibit 19 and paragraph 17 above.
[29] See Exhibit 20 and paragraph 19 above.
[30] See Exhibit 22 and paragraph 22 above.
[31] See Exhibit 21 and paragraph 20 above.
[32] See Exhibit 1 and paragraph 23 above.

Briefly, Mr. Goodman, the investigator:

(i) on March 15, 2005, took my affidavit;

(ii) in late March 2005, presented me with copies of Ms. Stokes and Ms. Broderick's affidavits and asked me to comment on;

(iii) on April 4, 2005, was supplied with a note from me, entitled "Rejoinder", in which I question the relevance of Ms. Broderick's affidavit on the ground that she was not present when the selectee was interviewed, and highlight parts of Ms. Stokes' affidavit that corroborated my contention of age discrimination;

(iv) on April 6, 2005, presented me with a note entitled "Addendum" – that made the same points as the "Rejoinder" in a less focused way – and asked me to review and sign it;

(v) on April 8, 2005, was presented with a signed copy of the "Addendum".

(vi) on April 15, 2005, presented me with a *changed/revised* affidavits of Ms. Stokes and Ms. Broderick and asked me to change the "Addendum" to be consistent with the new, revised affidavits. Ms. Stokes', having looked at the "Rejoinder" and original "Addendum" had changed parts of her earlier affidavit that I had identified as corroborating my contention, and elaborated other parts for greater consistency with Ms. Broderick's affidavit;

(vii) on April 16 or 17, 2005, was informed of my refusal to prepare a new "Addendum", and informed that he was going to file his ROI based on the *new/revised* affidavits of Ms. Stokes and Ms. Broderick and my old "Addendum".

(viii) on April 19, 2005, through an email from me, is reminded of the sequence of events in the investigation and teir irregularities;

11

(ix) on June 8, 2005, files his Report of Investigation (ROI) based on the new/revised affidavit of Ms. Stokes and Ms. Broderick and the old "Addendum" dated April 8, 200th. His ROI does not inclue nor makes reference to: the old affidavits of Ms. Stokes and Ms. Broderick, the "Rejoinder" of April 4, 2005, or my objection to investigative process of April 19, 2005.

26.     *Why the investigative sequence and irregularities amount to denial of due process?*

Victims would often find it difficult to substantiate their claim of employment discrimination. No sane employer will admit that it engages in unlawful discrimination in his/her hiring and promotion practices. In cases where an employer hires and fires a lot of workers, statistical evidence can be employed to detect presence/absence of employment discrimination. Statistical evidence can not be used to substantiate employment discrimination by an employer who hires infrequently and very few workers. In such cases, the chance of proving employment discrimination based on "preponderance of evidence" is very small. That chance is reduced to *zero* if the investigation of the complaint of a potential victim does not adhere to the strictest standards of fair, transparent, and honest procedures. And, I contend that the investigation of my complaint fell far short of the required standard and, hence, did amount to a denial of due process.

27.     A single job is advertised. Sixty applicants have the minimum qualifications required for the position, of which five highest scoring applicants make the "eligible list". Candidates in the "eligible list" have qualifications above the minimum required for the position. The highest scoring eligible-candidate has twice the age of any other eligible

candidate. He is by-passed, and the job is first offered to the 2nd highest scoring candidate and then to the fourth. This may or may not be evidence that the selecting manager engaged in age discrimination. The old, highest-scoring eligible candidate files a complaint of age discrimination. The employer hires an "independent" investigator to investigate the complaint. The investigator takes first the complainant affidavit, then the two selecting managers' affidavits. The selecting managers' affidavits are critical to the complainant's case. There is a chance, though a very slim one, that the selecting managers' affidavits contain statements that are consistent with the complainant's claim, or that they are inconsistent internally and/or with the records. The investigator provides the complainant with copies of the managers' affidavits and asks for his comments. To the complainant's delight, in their affidavits, the selecting managers, inadvertently or deliberately, make statements that are internally inconsistent and supportive of his claim. The complainant provides the investigator with written "Rejoinder" and "Addendum" on the affidavits highlighting the inconsistencies and pointing out to passages that support his contention. After a week, the investigator provides the complainant with *new/changed* affidavits of the two managers and commands him to change his "Addendum" to ensure consistency with the *new/changed* affidavits. Upon refusal to comply with the command, the complainant is informed that the Report of Investigation (ROI) will include the *new/changed* affidavits and the old "Addendum" without any reference to their inconsistencies, and will exclude the managers' old/original affidavits. The complainant, through an email to the investigator, registers his objections by recording the pertinent sequence of events. This email remains unanswered. The investigator proceeds to file his ROI. Not surprisingly, the ROI has no reference to the

managers' old/original affidavits, to the inconsistencies between affidavits and the "Addendum", or to the complainant's email highlighting investigative irregularities.

28. I plead that such an investigation and its report deprives the complainant of due process. An investigation of employment discrimination that permits the employer to *change/revise* its statements in reaction to the complainant's comments is a corrupt investigation. The report of an investigation that does not include all the pertinent records, does not highlight inconsistency between records, is a dishonest report. This court should sanction such investigators and their paymasters.

29. *Refusal by the Agency to acknowledge and address my reports of the investigative irregularities accentuated the denial of due process.* Note that in the context of requesting the Final Administrative Decision, this complainant did supply the Agency with documentation showing "egregious flaws" in the sponsored investigation and the ROI. Yet, the Agency refused to acknowledge or addressed this complainant's claim of investigative irregularities in its FAD and/or its answer to my Appeal of the FAD to EEOC.

30. *EEOC refusal to acknowledge and address my claim of denial-of-due process at the investigative phase is a "denial-of-due process" in and of itself.* The 18-page Statement of Appeal that I filed with the Commission details the investigative irregularities and how and why they were intended to - and did - deny me due process. Yet, the "Decision" issued does not betray any indication that the Commission is even aware that the denial-of-due process is the key component of my appeal.

31. Absent the investigative irregularities, my claim of age discrimination would have been substantiated through a close scrutiny of the records. I was twice as old as the

14

selectee. I had the highest score among eligible applicants; the selectee had the fourth highest score. The selecting managers' statements contained inconsistencies internally and with the records. The key reason offered by the two managers for giving the job to Mr. Tichenor rather than me was that: "it was an entry level job, …[that I] had a whole lot of experience,…[that the selectee] did not have any experience,…[and that my] experience was not relevant for the job…". I submit that the net implication of such statement is that the selecting managers did not want to give the job to an old person no matter what his/her qualifications.

32.    *I submit that I was a victim of age discrimination, and that I was denied due process by the investigator, the Agency, and the EEOC.*


THE RELIEF REQUESTED

The employment discrimination and the denial of due process, in addition to forgone earnings and litigation costs, damaged my reputations among my students, family, friends and colleagues. They have caused me loss of self esteem and confidence, depression, and withdrawals from friends and family. I humbly request the court to assess compensation for those financial and moral damages of $250,000.


Respectfully submitted:

*[signature: Hadi Mehrsefat]*

Hadi Mehrsefat

6200 Westchester Park Dr. #815

College Park, MD, 20740

# Attachment to Complain
## Of
## Hadi Mehrsefat

## Table of Exhibits

| Exhibit | Number of pages |
|---|---|
| Exhibit 1: EEOC Decision | 4 |
| Exhibit 2: Statement of Appeal | 18 |
| Exhibit 3: Personal Data | 9 |
| Exhibit 4: Vacancy Announcement | 5 |
| Exhibit 5: Position Description GS-5 | 5 |
| Exhibit 6: Position Description GS-7 | 5 |
| Exhibit 7: Screening Sheet | 2 |
| Exhibit 8: Personal Data, James Tischner | 10 |
| Exhibit 9: Certificates of Eligibles | 11 |
| Exhibit 10: Organizational Relationships of Witnesses | 1 |
| Exhibit 11: Affidavit, Hadi Mehrsefat | 10 |
| Exhibit 12: Notes from interviews | 10 |
| Exhibit 13: Affidavit, Ruth Stokes- Unsigned | 5 |
| Exhibit 14: Affidavit, Nancy Broderick- Unsigned | 5 |
| Exhibit 15: Rejoinder | 2 |
| Exhibit 16: Addendum | 4 |
| Exhibit 17: Affidavit, Ruth Stokes- Signed | 6 |
| Exhibit 18: Affidavit, Nancy Broderick- Signed | 5 |
| Exhibit 19: email to Ronald Goodman | 2 |
| Exhibit 20: Request for final decision | 2 |
| Exhibit 21: Final Agency Decision (FAD) | 16 |
| Exhibit 22: EEOC acknowledgment of receipt of appeal | 1 |