# Statement of Appeal

### Filed subsequent to the filing of Notice of Appeal

## TO

### The Equal Employment Opportunity Commission (EEOC), Office of Federal Operations (OFO),

### OF THE

# Department of the Interior Final Agency Decision (FAD)

### IN THE

### Employment Discrimination Complaint (Docket No. LSM-05-02)

## OF

# Hadi Mehrsefat, Complainant.

Signed and dated on October3, 2005
By Hadi Mehrsefat

**Of**
6200 Westchester Park Drive, #815
College Park, Maryland 20740

06 1060

FILED

JUN - 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## Statement of Appeal (SOA)

## Relative to the Department of Interior Final Agency Decision (FAD) in the employment discrimination complaint (LSM-05-02) of Hadi Mehresefat

## INTRODUCTION AND SUMMARY

1.      This statement and its attachments are filed pursuant to the notice of appeal that was filed on September 6, 2005. I, the appellant, am requesting that EEOC determine that the Department of Interior's Final Agency Decision (FAD) of August 8, 2005, is not based on impartial and appropriate factual record of my complaint (LSM-05-2); and that the agency's proffered reasons for my non-selection for the position of Economist (GS-01-0110-5/7, Vacancy Announcement Number OSM-2004- 0049) are mere pretexts. I request that EEOC sanction the Agency for impeding development of impartial and appropriate factual record relative to my complaint, and for ignoring the deficiencies of the investigations that were brought to its attention in a timely manner. As remedy, I request that EEOC make me whole: by granting me anonymity; by ordering the Agency to employ me at the Economist position, with pack pay and benefits; by compensating me for the discrimination-induced loss of self esteem and confidence, depression, withdrawal from friends and family; and by covering the costs incurred in pursuing this case.

## FACTUAL BACKGROUND

2.      I am a 57-years old American citizen of Iranian origin. I hold BA and MA degrees in economics and finance from accredited institutions of higher learning in Iran and United States. I have 3-years of work experience as government economist in Iran. And, since 1998, I have been teaching economics and finance courses in accredited universities in the Washington Metropolitan area.[1]

3.      In April 2004, the Agency announced vacancy for an Economist position (position no. GS-0110-05/07, announcement no. OSM-2004-0049, opening from 04/30/04 to 06/01/04).[2] The announcement states the incumbent **duties** as:

---

[1] See Exhibit 16 of the Report of Investigation of the Complaint of Discrimination Filed by Hadi Mehrsefat, LSM-05-02, hereinafter referred to as the ROI
[2] See Exhibit 8 of the ROI.

"...As a *trainee*, incumbent will work directly with senior economist and analyst *assisting* in initiating, formulating.... *Develops* specific detailed plans...*Assists* in the preparation of written reports... *Collects* detailed information from....*Analyze* and interpret factual economic statistics...*Analyzes* economic and statistical information requirements to develop... *Assists* in data gathering and statistical validation activities...*Prepares* and organizes materials...*May assist* team members on task forces...*Maintains* close contact with other agency officials..." (*italics* added)[3]

4.    The Vacancy Announcement (VA) did not distinguish between the duties of the Economist GS-5 level from those of GS-7. The position descriptions (PD) do.[4]  As expected, duties of an Economist at GS-5 position are less demanding than those of an economist at GS-7 position. Unlike the GS-7 economist, the GS-5 economist does not have the duty to "...Conduct basic economic and analytical studies; cost-benefit, regulatory and market analyses related to the surface coal mining industry".[5]  While the GS-7 economist has the duty to "[A]nalyze and interpret factual economic statistics...", the GS-5 economist is merely expected to "[A]ssist in analyzing and interpreting factual economic statistics...".[6]  Unlike the GS-7 economist, the GS-5 economist is not expected to "...[P]repare defensible extrapolation of statistical data, and where necessary, recommend additions and modification to the data agency needs for program evaluation purposes".[7] While the GS-7 economist is expected to "Coordinate data gathering and statistical validation activities...", the GS-5 economist is merely expected to "[A]ssist in data gathering and statistical validation activities..."[8]. And, while the GS-7 economist "[M]ay serve as a team member on task forces ...", the GS-5 economist "[M]ay *assist* team members  on task forces...".

5.    Under the qualification requirements for the GS-5 position, the VA stated that:

"For GS-5, Applicants must have (A) a bachelor's degree with major in economics that included at least 21 semesters hours in economics and 3 semesters hours in statistics, accounting or calculus, OR (B) Combination of Education and experience: courses equivalent ...."[9]

The PDs provide more details regarding the skills required for the GS-5 and the GS-7 positions. In the position descriptions, the knowledge and skills required for both GS-5 and GS-7 position are stated as:

---

[3] Op. cit, pages 1-2

[4] See Exhibits 9 and 10 in the ROI

[5] Compare 1st bullet in page 3 of Exhibit 9 in the ROI with the 1st bullet in page 3 of Exhibit 10 in the ROI.

[6] Compare 2nd  bullet in page 3 of Exhibit 9 in the ROI with the 2nd  bullet in page 3 of Exhibit 10 in the ROI.

[7] *Op.cit.*

[8] Compare 4th bullet in page 3 of Exhibit 9 in the ROI with the  4th bullet in page 3 of Exhibit 10 in the ROI.

[9] See page 2 of Exhibit 8 in the ROI.

"Factor 1 – Knowledge Required by the Position

    "Basic knowledge of professional economic procedures....

    Knowledge of automated database systems and databases, and techniques in order
to develop, modify and convert information for presentations, reports, analysis,
etc., and make recommendation for establishing/modifying database systems for
data collection efforts.
Ability to prepare spreadsheets and use various computer software such as Word,
Access, Excel, PowerPoint, etc.
Ability to understand written instructions ...
Ability to communicate effectively in writing ...
Evidence of strong interpersonal skills....".[10]

6.    Upon closing date for submission of application, in early June 2004, sixty
applicants were found eligible for the GS-5 position.[11]  Based on the applications, the
"Screening Sheet" automatically scored and ranked the 60 applicants on the basis of how
bests their qualifications matched those required for the GS-5 position. This appellant had
the highest score (97.48) and was ranked first among the applicants. The "Screening
Sheet" automatically screened out all but nine candidates with highest score.[12] Worthy of
note are the hand written notations on the "Screening Sheet". Someone specifies the
"cut-off score" at 95:00, thereby limiting the candidates to five. The five candidates'
educational attainments are scribed next to their names. There are additional notations
next to my name and that of James Tichenor (the selectee). Written next to my name is:
"BS/Economics? Diploma Mills, MS/Finance), thereby creating doubts regarding the
accreditation of the institution of higher learning that I got my BS from. Next to Mr.
Tichenor's name is written "BS/Economics & Math, GPA 3.73". A quick check of Mr.
Tichenor transcripts issued by Emory University indicates that his GPA was **3.169 and
not 3.73**.[13]

7,    Records indicate that the Human Resource Department found five applicants
eligible for the GS-5 level position in the "Certificate of Eligibles – NO. OSM-2004—
0049" that was issued on 06/23/04.[14] The "INSTRUCTION FOR Delegated Examining
Unit (DEU) Certificates" states, among other things, that "If there are more than three
names in the certificate, you must select from the first three available names before
considering subsequent names".[15] The "List of Eligibles" for the GS-5 level position
includes five applicants and their scores.[16] They are: (1) Mehrsefat, Hadi with the score
of 97.48; (2) Brigida, Mathew, with the score of 96.72; (3) Hibshman, Jonathan with the
score of 96.34; (4) Tichenor, James, with the score of 96.34; and (5) Pierce, Ajani with

---

[10] See pages 3-4 in Exhibits 9-10 of the ROI.
[11] See pages 1-5 of Exhibit 14 in ROI, entitled "Screening Sheet –Staging Area Applicant Listing,  office of
surface mining 0110 Economist GS-0110-05/07".
[12] See page 1 of Exhibit 14 in ROI.
[13] See page 10 of Exhibit 17 of the ROI
[14] See page 1 of Exhibit 15 of the ROI.
[15] See page 2 of Exhibit 15 of the ROI.
[16] See page 3 of Exhibit 15 of the ROI

the score of 95.08.[17] In the "List of Eligibles" sheet, next to the names of first four candidates, dates scribed are: 7/9/04; 7/8/04; 7/8/04; and 7/29/04.[18] These dates refer to the dates that interviews were conducted with the first four eligibles. In the first column, hand written notes specify (C/N) next to the 1st, 3rd, and 5th eligibles, and (A) -- indicating selected or appointed -- next to 2nd and 4th eligibles.[19] In that column, next to the 4th eligible, is written "accepted offer 8/17/04".[20] In the last column of the sheet, in the second row says that "The selectee declined offer 7/28/04", and in the 4th row says "effective 8/22/04".[21]

8.     Records indicate that the first three eligibles were interviewed on July 8th and 9th; 2nd eligible (Brigida) was offered the job on July 16th; and that he declined the offer on July 28th.[22] Records seem to indicate that shortly after being notified that the 2nd eligible has declined the job offer on 7/28/04, an interview was scheduled and conducted the next day (i.e., 7/29/04) at 10:30 am.[23] The expeditious interview of the 4th eligible after the declination of the 2nd indicates that, contrary to the "INSTRUCTION FOR DEU"[24], 1st and 3rd eligibles were never given a chance.

9.     Records indicate that aside from this appellant, the remaining four eligibles were in their mid-to-late twenties.[25]  Records also indicate that aside from this appellant, the remaining four eligibles were all US-born citizens.[26]

10.     After I was notified of non-selection for the GS-5 Economist position, I contacted and complained to an EEO Counselor in mid October 2004.[27] Failing to receive a meaningful consideration of my complaint from the EEO counselor, I filed a formal complaint of discrimination on 11/19/04.[28] The Agency acknowledged receipt of my complaint, and appointed Mr. Roland Goodman, of SOUTHWIND, to investigate my complaint on 01/21/05.[29] Mr. Goodman issued his ROI on June 8th, 2005.

11.     *Mr. Goodman, the Agency's investigator, deliberately undermined the integrity of the investigative process. This can be ascertained upon scrutiny of the key exhibits in the Record of Investigation (ROI) filed by Mr. Goodman, and the attachments to this SOA that Mr. Goodman deliberately left out of his ROI.*

---

[17] *Op.cit.*
[18] *Op. cit.*
[19] *Op. cit.*
[20] *Op.cit.*
[21] *Op.cit.*
[22] Op. cit, and page 7 of Exhibit 18 of the ROI.
[23] Op.cit., and page 9 of Exhibit 6.1 of the ROI.
[24] See page 2 of Exhibit 15 of the ROI.

[25] See Exhibits 16, 17, 18, 19, and 21 of the ROI.
[26] *Op.cit.*
[27] See Exhibit 2 in the ROI.
[28] See page 2 of Exhibit 1 of the ROI.
[29] See pages 5-6 of Exhibit 2 of the ROI.

12.    Exhibits 5, 7, 5.1, 6 and 6.1 in the ROI are key to Mr. Goodman's investigation and his "Summary"[30]. They also display the corruption of the investigative process. Exhibit 5 is this appellant's "Affidavit", dated and signed at Mr. Goodman's presence on March 15th. Exhibit 7 is Ms. Broderick's "Affidavit" that seems to have been signed and dated at Mr. Goodman presence on March 24th, 2005, nine days after the date of my Affidavit[31] Exhibit 5.1 is an "Addendum" that I signed at Mr. Goodman's presence on April 8th. In the "Addendum", this appellant makes verbatim quotes from Ms. Broderick and Ms. Stokes affidavits.[32] Exhibit 6 is an Affidavit that seems to have been signed and dated by Ms. Stokes, the selecting official, at Mr. Goodman's presence, on April 14th, 2004.[33] Also dated April 14, 2005 , is Exhibit 6.1 which is a note from Ms. Stokes to Mr. Goodman entitled "RE: Notes from Interviews for GS-5 Economist Position".[34] Note that according to the ROI, Ms. Stokes, the selecting official, is the last person that Mr. Goodman interviewed. Indeed, the ROI shows that I wrote my "Addendum" in rebuttal of Ms. Stokes statement on 04/08/05, six days before she had the opportunity to sign up to her "Affidavit"!

13.    The truth is that Mr. Goodman's ROI neither reflects the investigative sequence nor is complete. The investigative sequence was as follows. In late March, Mr. Goodman showed me, but did not supply me with, copies of Ms. Stokes "Notes from Interviews...". Also in late March, Mr. Goodman supplied me with copies of Ms. Broderick's and Ms. Stokes affidavits and asked me to prepare comments or rejoinders on them. Copies of Ms. Broderick's and Ms. Stokes' affidavits that I was given are attached to this SOA as Attachments #1 and #2, respectively. Note that except for signatures and dates, Ms. Broderick's "Affidavit" in Attachment #1 to this SOA is identical to that of her "Affidavit" in Exhibit 7 of the ROI. In Ms. Stokes case, only the first two pages of her "Affidavit" in Attachment #2 of this SOA are identical to those of her "Affidavit" in Exhibit 6 of the ROI.

14.    Pursuant to Mr. Goodman's instructions of late March 2005, I prepared and submitted a two page comments on the affidavits, entitled Rejoinder, to Mr. Goodman on April 4, 2005. A copy of my Rejoinder is attached to this SOA as Attachment #3. What is noteworthy in the "Rejoinder" is the direct quotations from Ms. Stokes and Ms. Broderick's affidavits that are in Attachments #1 and 2 to this SOA.

15.    A couple of days after submission of the Rejoinder, Mr. Goodman asked me to sign a note entitled "Addendum"[35] that he had prepared on my behalf. I reviewed the "Addendum" and found that it presents the points in my "Rejoinder" in less-focused manner. For instance, in the "Addendum", I seem to refer or quote from Ms. Stokes and Ms. Broderick statements rather that quote from their affidavits. Nevertheless, I signed the "Addendum" at Mr. Goodman's presence on 04/08/05 partly out of respect for Mr.

---

[30] See the ROI, pages 5-9.
[31] See Exhibit 7 of the ROI.
[32] See for instance lines 11-13, page 2, Exhibit 5.1 of ROI.
[33] See Exhibit 6 of the ROI.
[34] See Exhibit 6.1 of the ROI.
[35] See Exhibit 6.1 of the ROI.

Goodman, but also because I found the substance of the "Addendum" in line with the "Rejoinder".

16.    On April 15th, 2005, Mr. Goodman informed me that Ms. Stokes has *changed* her "Affidavit". He wanted me to change my "Addendum" to be consistent with Ms. Stokes changed and changing "Affidavits". I strongly objected to Mr. Goodman allowing Ms. Stokes changing her "Affidavits" after seeing my "Rejoinder" and "Addendum". Mr. Goodman withdrew his request that I revise my "Addendum", and informed that he was going to finalize his ROI based on Ms. Stokes revised "Affidavit" and my unrevised "Addendum".

17.    In an email dated April 19 and addressed to Mr. Goodman, I recorded the sequence of events and reiterated the flaws in the investigations as I saw them at the time.[36] This email, that is Attachment #4 to this SOA, remained unanswered.

18.    On June 8th, 2005, Mr. Goodman filed his Report of Investigation (ROI). The ROI is incomplete because it does not include documents that are attached to this SOA[37]: unsigned affidavit of Ms. Broderick, unsigned affidavits of Ms. Stokes, my Rejoinder, and my email to Mr. Goodman of April 19.

19.    In a letter dated June 30th, 2005, in the context of requesting the Agency's Final Decision, I brought the deficiencies that I perceived in Mr. Goodman's investigation to the Agency's attention.[38] Yet, as evidenced by the FAD and its covering letter dated August 8th, 2005, the Agency refused to acknowledge and address the deficiencies..

20.    The FAD of August 8th -- based on improperly developed and incomplete record of investigation as it is -- acknowledges the *prima facie* of my age-and-nationality-based discrimination claim. But it also contends that the ROI shows that the Agency had "legitimate, non-discriminatory reasons" to select Mr. Tichenor, rather than me, for the GS-5 level economist position.

## DISCUSSION AND ANALYSIS

21.    *The prima facie of my age-and-nationality based discrimination claim remains unchallenged. The Agency has denied me a reasonable opportunity to prove my employment discrimination claim by conducting a partial and improperly-motivated investigation of my complaint, and by refusing to acknowledge and/or address investigative deficiencies that I brought to its attention. The Agency's proffered "reasons" for my non-selection are illegitimate because they are based on corrupt investigation and incomplete investigative records. Even if one disregards the corruption of the investigative records, however, the Agency's proffered reasons are mere pretexts for age-and-nationality based discrimination.*

---

[36] See Attachment #4 to this SOA.
[37] See Attachments #1-4 to this SOA.
[38] See Attachment #5 to this SOA.

22. ***The prima facie of my age-and-nationality based discrimination claim remains unchallenged.*** Records indicate that, of the five individuals identified in the "List of Eligibles"[39], all except this appellant were in their mid-20s and US-born[40]. I am 57 years old and Iranian-born.

23. ***The Agency did not develop impartial and proper factual record of my complaint.*** An unbiased investigator would have interviewed Ms. Stokes, the selecting official, early on in the investigation process. Yet, if one believes the ROI, Ms. Stokes was the last person interviewed.[41] It requires a suspension of credulity to believe that I was able to sign and date at Mr. Goodman's presence an "Addendum" on rebuttal of Ms. Stokes' statements on 04/08/05 prior to Ms. Stokes making the statements on 04/14/05.[42] Whether or not March 24th is the date that Ms. Broderick signed and dated her "Affidavit" at Mr. Goodman's presence, Mr. Goodman supplying me with an *unsigned* or fake copy of that affidavit in late March 2005 does not inspire confidence in the integrity of his investigation.[43]

24. ***The Agency's investigative records are incomplete.*** The ROI does not include the unsigned affidavits of Ms. Broderick and Ms. Stokes that Mr. Goodman gave me in late March 2005.[44] The ROI also excludes my "Rejoinder" of April 4th and my email of April 19th.[45]

25. ***The Agency's departure from standard investigative process and proper development of records of my complaint was improperly motivated in that it was intended to deny me a reasonable opportunity to prove my employment discrimination claim.*** Note that the Agency bases its denial of my discrimination claim on three documents: Ms. Broderick's Affidavit, Ms. Stokes' Affidavit, and Ms. Stokes' "interview notes". As indicated in my Rejoinder and Addendum, Ms. Broderick's Affidavit could not provide a basis for denial of my discrimination claim because she states that she was on leave when the selectee was interviewed and selected. The Agency had no incentive to change Ms. Broderick's Affidavit. Accordingly, Ms. Broderick's unsigned and signed affidavits -- in Attachment#1 to this SOA and Exhibit 7 of the ROI -- are identical. The same can not be said about Ms. Stokes' affidavits and 'interview notes'. In my Rejoinder and Addendum, I point to Ms. Stokes unsigned Affidavit where she says that the selectee was better qualified than me because, unlike me, he "…did not have a whole lot of experience".[46] Accordingly, upon seeing my Rejoinder and/or Addendum, Ms. Stokes made a lot of changes in her affidavit to minimize comparison of my experience with

---

[39] See page 3 of Exhibit 15 of the ROI.

[40] See Exhibits 16, 17,18,19, and 21 of the ROI.

[41] Note that the ROI indicate that three individuals were interviewed by Mr. Goodman. This appellant was interviewed on March 15, 2005 (Exhibit 5 of ROI); Ms. Broderick was interviewed on March 24th, 2004 (Exhibit 7 in ROI); this appellant signed an "Addendum" on rebuttal of Ms. Stokes and Ms. Broderick statement on April 8th, 2005; and then Ms. Stokes were interviewed on April 14th, 2005.

[42] Compare date of the "Addendum" in Exhibit 5.1 with that of Ms. Stokes' statement in Exhibit 6.

[43] See Exhibits 5.1 and 7 of the ROI, as well as Attachments #1, #3, #4.

[44] See Attachments #1-2 to this SOA.

[45] See Attachments #3-4 to this SOA.

[46] See paragraph 2, page 2 of Rejoinder in Attachment #3 to this SOA.

those of the selectee. In my Rejoinder and Addendum, I refrained from challenging factors enumerated for my non-selection other than experience. Accordingly, changes in Ms. Stokes affidavit try to highlight that the selectee was better qualified than me on grounds (e.g., experience) other than experience. Similar motives may have prompted changes in Ms. Stokes interview notes. As detailed in the ensuing discussion of the documents, the Agency's motive for changes in Ms. Stokes' Affidavit can be none other than denial of reasonable opportunity to prove age-based discrimination.

## Ms. Broderick's Affidavits

26.    As was indicated before, Ms. Broderick's signed and dated "Affidavit" in Exhibit 7 of the ROI is identical to her unsigned Affidavit that Mr. Goodman supplied in late March and is Attachment #1 to this SOA. Ms. Broderick's "Affidavit"[47] does not provide any basis for assessing the Agency's "proffered reason" for not selecting this appellant and/or for the Agency's selection of the selectee.

27.    When asked why the selectee was selected, without any hesitation, Ms. Broderick states that: "I thought he was the best qualified. Ms. Stokes asked for my opinion".[48] Yet, when asked what criteria she used in her determination that the selectee was the best qualified candidate, she states that: "I was not aware of his qualifications. I was not in the office when he came in for interview...Ms. Stokes related his qualification and experience...I had scheduled annual leave."[49]

28.    Ms. Broderick claims that "in conjunction with Ms. Stokes"[50], she interviewed "at least 12"[51] candidates, and that at the time of interviews she "did not know which particular position they were applying for".[52] Ms. Broderick states that in the interviews "...as the Senior Economist, my role was to ask two questions related to quantitative data analysis".[53] In other words, Ms. Broderick asked two identical questions from 12 interviewees for positions GS-5 to GS-9, of which only three were candidates for the GS-5 position!. When asked what she was looking for in the 12 candidates she interviewed, Ms. Broderick states that:

> "A person who could do problem solving. Someone who upon being given a problem could through an intelligent process determine how to solve it qualitatively. The person *must have experience in cost-benefit analysis* and hands on computer skills"[54]. (*Italics added*).

---

[47] See Exhibit 7 in the ROI.
[48] See lines 40-42, page 3 of 5, in Exhibit 7 of ROI.
[49] See lines 22-35, page 4 of 5, in Exhibit 7 of ROI.

[50] Op. cit, line 7 in page 3 of 5.
[51] Op. cit, line 11 in page 3 of 5.
[52] Op. cit, line 11 in page 3 of 5.
[53] Op. cit., line 22-23, page 2 of 5.
[54] Op. cit., lines 35-38, page 3 of 5.

Later on in her affidavit, Ms. Broderick states that the appellant "...had more business skills than *economic cost benefit analysis skills*".[55] Please note that the qualifications that Ms. Broderick was looking for (e.g., cost benefit analysis skills) corresponds to the qualifications required for the incumbent at the GS-7 Economist position, and *not for the GS-5 economist position that this appellant had applied for or the position the selectee was selected for.* [56]

29.    When asked for her reaction to my claim of discrimination based on national origin, Ms. Broderick states that "[I]t did not play into my decision at all".[57] Yet, earlier on, when asked about her reaction to my claim that my answers to the interview questions were detailed but not *vague*, Ms. Broderick states that:

> "I still maintain that Mr. Mehrsefat's answer were vague. He gave an extensive explanation about leaving *Iran*, after arriving in the United States spent the next 20 years opening a car dealership and a restaurant, and then eventually teaching school. All of these were general in nature...."

Well. If I "gave an extensive explanation about leaving *Iran...*", it must have been in response to the questions asked about my background and experience. My responses may have been extensive and general in nature, but they could not have been vague. And, if my answers were too "extensive ...and general in nature" for Ms. Broderick's tastes, as an interviewer, she could have asked me to be brief and to the point. What is revealed by Ms. Broderick's statement is that my answers to questions regarding my national origin and life experience was offensive to her, stuck up in her mind, and is regarded by her as vague and illustrative of my answers to any question! It is self-evident for Ms. Broderick that someone with a background such as mine could not, but provide "vague" answers to a question.

## Ms. Stokes 1st and 2nd Affidavits: A Comparison

30.    Ms. Stokes had two affidavits. Her 1st or unsigned and undated affidavit that Mr. Goodman gave me in late March, 2005, is Attachment #2 to this SOA. Her 2nd Affidavit is Exhibit 6 in the ROI. First affidavits have five pages and second one has six pages. Pages 1-2 of the 1st affidavit are identical to those of the 2nd, except that Ms. Stokes has initialed bottom of pages of the 2nd affidavits but not the 1st. Last paragraph of the 1st affidavit is identical to that of the 2nd, except that Ms. Stokes and Mr. Goodman have not signed or dated the 1st affidavit. Questions (Qs) in the two affidavits are identical, but answers (As) in pages 3-5 of the second affidavit are different than the answers in pages 3-4 of the fist affidavit. Lines 41-44, in page 4 of 5 of the 1st Affidavit are identical to lines 18-22, in page 5of 6 of the 2nd Affidavit. Finally, the first 17 lines of the 3rd page of the two affidavits are, with minor exceptions, the same.

---

[55] See line 18 in page 4 of 5, Exhibit 7 of ROI.

[56] See paragraph 4 above. Also, compare 1st bullet in page 3 of Exhibit 9 in the ROI with the 1st bullet in page 3 of Exhibit 10 in the ROI; 2nd bullet in page 3 of Exhibit 9 in the ROI with the 2nd bullet in page 3 of Exhibit 10 in the ROI; and 4th bullet in page 3 of Exhibit 9 in the ROI with the 4th bullet in page 3 of Exhibit 10 in the ROI.

[57] See line 1, page 5 of 5, Exhibit 7 of ROI.

31.    In what follows we make a detailed comparison of the 1st and 2nd affidavits. What should not be missed out is that in the 2nd Affidavit, unlike in the 1st, Ms. Stokes refrains from making "experience" a disqualifying factor for the position. The importance of data collection and computer skills is elevated in the 2nd Affidavit. And, in both Affidavits it is repeatedly emphasized that the position was a "trainee" or "entry-level" one requiring particular skills or lack of.

32.    What did Ms. Stokes do with the notes she claimed to have taken at the time of interviews? In response to that question, in her 1st Affidavit, Ms. Stokes states that she used the notes "...as a supplement to the application...[and]...to make comparison of the responses .."[58]. In her 2nd Affidavit, Ms. Stokes seems to provide a more elaborate answer. She states that she used the notes:

> "...as a supplement to the application ... for additional information....During the interview, the applicant was also asked *two problem solving* questions that apply to our work, and that discussion was helpful in seeing how the applicant would apply *economic concepts to a situation.* I referred to my notes during the review of the applicants and to refresh my memory on his/her responses during the interview. I usually.....I am not ..."[59] (*Italics added*)

Why did Ms. Stokes provide a more elaborate answer in her 2nd Affidavit? In my "Rejoinder" and "Addendum", I had dismissed Ms. Broderick's Affidavit exclusively on the ground that she did not interview the selectee, was not present when the selectee was hired, yet she found the selectee to be the best qualified for the position.[60] This must have misled Ms. Stokes, Mr. Goodman, and Ms. Broderick into believing that I would not challenge other parts of her Affidavits.. To bolster the credibility of Ms. Stokes statement, Stokes, *et. al.* tried to incorporate points from Ms. Broderick's Affidavit into that of Ms. Stokes 2nd . Note that the reference to the "...two *problem solving* questions ... [and application] of ... *economic concepts...*" in the above quotation are taken directly from Ms. Broderick's Affidavit of March 24th, 2005.[61] Ironically, Ms. Stokes' 2nd Affidavit, unlike her 1st, highlights the fact that the "...two *problem solving* questions ..." were asked from all the 13 interviewees, irrespective of whether they were candidates for the GS-5, the GS-7, or the GS-9 position.[62] And, like Ms. Broderick, Ms. Stokes is not and was not aware that the "...*problem solving* ..." qualifications and skills required for the GS-7 or GS-9 positions, were not required for the GS-5 level position.[63]

33.    When did Ms. Stokes supply Mr. Goodman with her "notes of the interview sessions"? And, what credence can be attached to the notes?

---

[58] See lines 18-19 of page 3 of 5 of Attachment #2 to this SOA. Also see lines 3-16, of page 3 of 6, of Exhibit 5.1 in the ROI.
[59] See lines 19-27 of page 3 of 6 of Exhibit 6 of the ROI.
[60] See paragraphs 4-5 of page 1 of the Rejoinder in Attachment #3 to this SOA.
[61] See line 35 and 37 of page 3 of 5 of Ms. Broderick Affidavit in Exhibit 7 of ROI.
[62] See lines 1-27 in page 3 of 6 of Exhibit 6 in ROI.
[63] See paragraph 33 above.

The ROI seem to indicate that Ms. Stokes supplied Mr. Goodman with a copy of her notes as late as April 14th, 2005.[64] Yet, in late March 2005, while supplying me with the affidavits to write rebuttal on, Mr. Goodman showed me copies of Ms. Stokes interview notes. I examined the notes, particularly the ones that Ms. Stokes' had claimed to have taken during my own interview on 07/09/04. And, I am dead certain that the supposed observation by Ms. Stokes that I "...spend too much time on details – more than time allowed"[65] was not in the version of the notes that I saw in late March 2005. I suspect that Ms. Stokes et. .al., added the comment to the interview notes to bolster claim by Ms. Broderick that my answers at the interview "...were vague ... extensive... general in nature".[66] And, if Ms. Stokes did effect a change in the notes, even a minor one, in mid-April, 2005, what confidence could one have that the notes were prepared at the time of interviews in July 2004, and not months later after my complaint of discrimination?

34.    What was Ms. Stokes looking for in a candidate for the GS-5 position? In her 1st Affidavit, Ms. Stokes responds that:

> "It is an *entry level* position with the potential for progressing to GS-12. I was looking for someone who *could* come in and *be trained*. I wanted someone who could pull together data and analyze it, *not someone knowing a lot*. Nancy Broderick, our senior economist, would be training the person."[67] (*Italics added*)

Well. Aside from age, what characteristic in the candidates enabled Ms. Stokes to assess and compare their suitability for "...an *entry level* position with ... GS-12"? How did she assess and compare candidates' ability to "...*be trained*"? Does she believe that the ability to *be trained* is inversely correlated with age? Does age, experience or *"knowing a lot"* impede a person's ability to "...pull together data and analyze it."?

35.    In her 2nd Affidavit, when asked what was she "looking for in a candidate for the GS-5 position", Ms. Stokes states that:

> "It is *an entry* level position with the potential for progressing to a GS-12 level. I was looking for someone who had the *basic skills* to do the job and *would grow in the position*. The position at this level required someone who would be working directly with a senior economist and *assisting* in components of *pulling together data* for various economic analyses and studies. The initial work would involve collecting detailed information from internal sources and assisting in statistical validation activities. Nancy Broderick, our Senior Economist, would be mentoring and training the individual selected."[68] (*Italics added*)

---

[64] See lines 34-36 of page 3 of 6 of Exhibit 6 in ROI, and page 1 of 10 of Exhibit 6.1 in ROI.
[65] See handwriting to the right of question 8, page 8 of 10, Exhibit 6.1 of ROI.
[66] See paragraph 34 above.
[67] See lines 33-36, in page 3 of 5, in Attachment #2 to this SOA.
[68] See line 40 in page 3 of 6, through line 4 in page 4 of 6, in Exhibit 6 of the ROI

Ms. Stokes no longer is looking for "someone who *could* ...be trained... *could* pull together data and analyze it, *not someone knowing a lot*". Instead, she is looking for someone with "... the *basic skills*... [who] *would grow in the position* ...assisting...[in] pulling together data". Had quotation of the phrase "*knowing a lot*" in my Rejoinder[69] and the distinction between *assisting* in and undertaking of data collection and analyses in my Addendum[70]anything to do with the change in Ms. Stokes' response?!

36.    What criteria did Ms. Stokes use in her determination that the selectee was the person for the GS-5 position? The criteria highlighted by Ms. Stokes in her 1st Affidavit are: "Educational requirements, skills to collect and analyze data, and a person's ability to grow in the position".[71] Those she highlights in her 2nd Affidavit are:

> "Educational requirements, skills to collect and analyze data, *ability to apply economic principles to our work*, and a person's ability to grow in the position. *Also, it was important to have someone who had basic skills to organize data in electronic format for analysis work.*"[72] (*Italics added*)

By 04/14/05 and her 2nd Affidavit, Ms. Stokes adds "... ability to apply economic principles ...and basic skills to organize data in electronic format" to the criteria she claims to have used in the selection for the GS-5 position in July 2004.

37.    When asked what she meant by "...*ability to grow in the position*" as a selection criterion, in her 1st Affidavit, Ms. Stokes states that:

> "A person who basically would take direction and see this as a learning process to further develop *their* skills and see it as a career. Someone doing hands on work and *following directions.*"[73] (*Italics added*)

In her 2nd Affidavit, Ms. Stokes adds to the characteristic of someone who is able "...to grow in the position". She says that the person is able "...to grow in the position" that:

> "A person who basically would take direction and see this as a learning process to further develop *his/her* skills and see it as a career. Someone doing hands-on *detailed* work of *gathering data as the basis for further economic analysis.*"[74] (*Italics added*).

Italics in the above quotations highlight where Ms. Stokes response to the question in her 2nd Affidavit differed from that in her 1st.

---

[69] See paragraph 2 of page 2 of the Rejoinder in Attachment #3 of this SOA.

[70] See lines 14-15 of page 2 of 6 of Exhibit 5.1 of the ROI.

[71] See lines 41-42 in page 3 of 5 of Attachment #2 to this SOA.

[72] See lines 9-12 in page 4 of 6 of Exhibit 7 in the SOA.

[73] See lines 1-3 in page 4 of 5 of Attachment #2 to this SOA.

[74] See lines 15-19 in page 4 of 6 of Exhibit 6 of the ROI.

38.    When asked about the relationship between the criteria she claimed to have employed to the GS-5 position, in her 1st Affidavit, Ms. Stokes responded: "Entry level, trainee and data analysis and collection as the beginning of the process."[75] And, in her 2nd Affidavit, she responded:

> "Entry level, trainee, and data analysis and collection as the beginning of the process. *Skills to apply economic concepts to our work and in the organization of the data so that it can be used for analyses are also key criteria.*"[76] (*Italics added.*)

Italics in the above quotation set apart Ms. Stokes response in her 2nd Affidavit from that in her 1st.

39.    Ms. Stokes is asked: "With regard to the criteria you used, will you compare the Complainant and Selectee, stating which was the candidate against each criterion, with examples for your reasons leading to your conclusion?"[77] In her 1st Affidavit, Ms. Stokes responds that:

> "Both met the educational requirements.
>
> The selectee had conducted surveys and completed grant proposals outlining steps and goals. He had recent date base management experience and current computer applications. *He did not have a whole lot of experience and* would be at the entry level.
>
> The Complainant was *an instructor*. I do not recall his relating data base information other than in grading *his* papers. *For a trainee position he was already above the level of what we were looking for. The main thing was who would fit best for the position.*"[78]

Two points is worth noting.  One is the criterion that Ms. Stokes used for gauging suitability for the trainee (entry-level) position. For the entry level position, she found the selectee suitable because "[H]e did not have a whole lot of experience", and this appellant unsuitable because I "...was already above the level ... [she] ...was looking for." A second point relates to the source or basis used to assess my "data base information" and computer skills and those of the selectee's. In my case, Ms. Stokes does "not recall relating data base information other than in grading [my] papers". True. In the notes that Ms. Stokes claims to have taken during my interview of 07/09/04 she has scribed that "...offered a stack of student evaluations to us for review".[79] But it requires a suspension of credulity to believe that I offered a stack of student evaluations

---

[75] See lines 7-8 in page 4 of 5 of Attachment #2 to this SOA.

[76] See lines 22-24 in page 4 of 6 of Exhibit 6 of the ROI.

[77] See lines 10-12 in page 4 of 5 of Attachment #2 to this SOA, and lines 26-28 in page 4 of 6 of Exhibit 6 of the ROI.

[78] See lines 16-24 in page 4 of 5 in Attachment #2 of this SOA.

[79] See handwritten notes above question 11, in page 8 of 10, in Exhibit 6.1, of the ROI.

to demonstrate my "data base information" and computer skills. Indeed, Ms. Stokes' interview notes do not provide any clue as to my "data base information" and computer skills, or lack there of.[80] But then, neither do they provide clues as to the selectee's "data base information" and computer skills.[81] Ms. Stokes knowledge of the "surveys" that the selectee conducted, the "grant proposals" that he completed, or his "...*recent* data base management experience and *current* computer applications" comes from the selectee's "RESUME".[82] Had Ms. Stokes bothered to look at my "RESUME"[83], she, too, would have found the assertion that my "data base information" was limited to "grading papers" incredible. Nonetheless, it is a given that an "instructor" with my age and nationality may be able to use computer to grade papers, but s/he would be a total idiot when it comes to "...*recent* data base management ... [or] ...current computer applications".

40.    In her 2nd Affidavit, Ms. Stokes states that:

"Both met the educational requirements.

The selectee had *demonstrated ability in data collection and methodology;* recent data base management experience to organize the data; and current computer applications *that would enable analysis of the data. He demonstrated knowledge of economic concepts. He* conducted surveys and completed grant proposals outlining steps and goals. *His skills* would be at entry level.

The Complainant was *a current professor at Strayer University and taught economics.* I do not recall his relating data base information other than in grading *student* papers. *His experience was very accomplished, but not related to data to data collection and data base management skills at the entry level.*"[84] (*Italics* added. They highlight what is not found in Ms. Stokes' 1[st] Affidavit.)

41.    When asked to "summarize why Complainant was not selected?", in her 1st Affidavit, Ms. Stokes responds that:

"Because *I felt the selectee was better* qualified *to do the level of work at the trainee level*".[85]

And, in her 2nd Affidavit, she responds that:

"Because *he was not the best* qualified *for the GS-5 position*"[86]

42.    When asked to "summarize why the selectee was selected", in her 1st Affidavit, Ms. Stokes responds that:

---

[80] See pages 7-8 of Exhibit 6.1 of the ROI.
[81] See pages 9-10 of Exhibit 6.1 of the ROI.
[82] See pages 5-7 of Exhibit 17 in the ROI.
[83] See pages 5-8 of Exhibit 16 in the ROI.
[84] See lines 30-42, in page 4 of 6, in the ROI.
[85] See lines 28-29 in page 4 of 5, of Attachment #2 to this SOA.
[86] See line 5, page 5 of 6, Exhibit 6, in the ROI.

"The same reason why the Complainant was not. I felt he was better qualified to work at the trainee level."[87]

And, in her 2nd Affidavit, she responds that:

"He was the best qualified for the position. He had the skills set at the appropriate level."[88]

43.    ***Even if one was to disregard the corruption of the investigative records, however, the Agency's proffered reasons would not stand scrutiny. They proffered reasons must be judged as pretexts.*** Disregarding the investigative corruption means accepting Ms. Stokes 2nd Affidavit as both timely and the only affidavit that she prepared in connection with my complaint. It also means accepting that Ms. Stokes "interview notes" were the ones she prepared in 2004, and never changed or added any item on them.

44.    In her 2nd Affidavit Ms. Stokes essentially claims that the selectee ( 4th in score) better qualified for the job than this appellant (1st in score)  and/or Mr. Hibshman (3rd in score). Ms. Stokes proffered hypothesis is that the selectee was better qualified on: (a) the strength of his data collection/ management and computer skills, and (b) his other "skills [being] set at the appropriate level"[89]. To disprove this hypothesis I have to first show that, in data collection/management and computer skills, the selectee was no stronger than Mr. Hibshman or me. And, second, show that the selectee's other skills being deemed set at the appropriate (i.e., entry or trainee) level can only mean that he is younger, less experienced, and has lesser academic credentials that me and Mr. Hibshman.

45.    My data collection/management and computer skills are at the level specified in the "Position Description" for the GS-5 job. As indicated in paragraph 5 above, the "Position Description", in part, says that the incumbent should have:

"*Knowledge* of automated database systems and databases, and techniques in order to develop ... *Ability* to prepare spreadsheets and use various computer software such as Word, Access, Excel, PowerPoint, etc."[90]

And,  the resume that I submitted as part of my application for the job, I state that:

"In addition to commonly-used software, I am familiar with MS Excel ...Access I have worked in Window 98 and Window 2000 environment and very comfortable with internet browser".[91]

---

[87] See lines 33-34, page 4 of 5, in Attachment #2 to this SOA.
[88] See lines 7-8, page 5 of 6, Exhibit 6, the ROI.
[89] *Op. cit.*
[90] See pages 3-4 in Exhibits 9-10 of the ROI.
[91] *Ibid.* see page 7 of 17 in Exhibit 16 of the ROI.

Note that "commonly-used software" refers to Microsoft Office.

46.     The selectee is weaker than Mr. Hibshman in data collection/management and computer skills.

In his resume, the selectee claims that he is "[P]roficient in Microsoft Word, Excel, Access, and FrontPage".[92]

And, in his resume, Mr. Hibshman states that:

> "Excellent 10-key skills. Proficient in Excel, Word, Impla@ Economic Impact Modeling System, Power Point, and Office. Excellent computer skills including word processing and internet research."[93]

Note that Mr. Hibshman is clearly stronger than the selectee in data collection and computer skills. Mr. Hibshman was ahead of the selectee in the overall score. Mr. Hibshman was interviewed on 07/08/04 by Ms. Stokes and Ms. Broderick. The selectee was interviewed only by Ms. Stokes on 07/28/04, after Mr. Brigida had declined the job offer. Question: If data collection and computing skill was a determining qualification, why the job was not offered to Mr. Hibshman?

47.     If not the data collection and computer skill, what other skills of the selectee was set "appropriate level" for the job? In her 2nd Affidavit, Ms. Stokes defines "other skills" for the "entry level, trainee positions" as someone that is able to:

> " ...to grow in the position... to have basic skills...to take direction ... to see this as learning process ...to see it as a career ...[to see] it as the beginning of the process"

Can anyone older and with a degree higher than the selectee be also stronger than the selectee in the ability to:

> " ...to grow in the position... to have basic skills...to take direction ... to see this as learning process ...to see it as a career ...[to see] it as the beginning of the process"?

Ms. Stokes' answer in her 2nd Affidavit is an emphatic NO.

## REMEDIES REQUESTED

48.     EEOC should sanction the Agency for impeding development of impartial and appropriate factual record relative to my complaint, and for ignoring the deficiencies of the investigations that were brought to its attention in a timely manner.

---

[92] See page 7 of 12 in Exhibit 17 of the ROI.
[93] See page 7 of 14 in Exhibit 19 of the ROI.

49     As remedy, I request, first and foremost, anonymity. I teach at the universities in the Washington area. Some of my students work at the Federal Government. It would be highly embarrassing for my students, colleagues, friends and family if they find out, through EEOC publications that I have not been found qualified for an entry level Economist position. It may also jeopardize my current teaching position.

50.     Also, as remedy I request that EEOC make me whole: by ordering the Agency to employ me at the Economist position, with pack pay and benefits; by compensating me for the discrimination-induced loss of self esteem and confidence, depression, withdrawal from friends and family; and by covering the costs that I have incurred in pursuing this case.

Respectfully submitted:

Hadi Mehrsefat

6200 Westchester Park Dr. #815
College Park, MD, 20740

18