

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

AUG 0 8 2005

REFER TO:
LSM-05-02

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mr. Hedi Mehrsefat
6200 Westchester Park Drive #815
College Park, Maryland 20740

Dear Mr. Mehrsefat:

This is in reference to the complaint of discrimination filed by you against the Department of the Interior (DOI), Office of Surface Mining (OSM), Planning, Analysis and Budget Office on November 19, 2004. A copy of the completed report of investigation (ROI) was sent to you on June 8, 2005. You received the ROI in which you were notified of the thirty days to respond to the Election Notice. The agency received your election of a final agency decision (FAD) without a hearing on July 7, 2005. Therefore, the attached final agency decision without a hearing was subsequently prepared.

Accordingly, this Office analyzed the entire complaint files, including the record of investigation. Based on our review, we have prepared the enclosed analysis, which explains the Department of the Interior's final decision regarding your complaint. This notice is the final agency decision regarding the complaint. If you are dissatisfied with this decision, please follow the appeal rights enclosed in the decision.

Sincerely,

Sharon D. Eller, Director,
Office of Civil Rights

Enclosures -   Final Agency Decision
               EEOC Appeal Form

cc:        James E. Joiner, Equal Opportunity Officer, Office of Surface Mining

21



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

AUG 0 8 2005

**DEPARTMENT OF THE INTERIOR
FINAL AGENCY DECISION**

| | | |
|---|---|---|
| IN THE EMPLOYMENT DISCRIMINATION COMPLAINT | ) ) ) | DOCKET NO. |
| OF | ) ) | LSM-05-02 |
| HEDI MEHRSEFAT, COMPLAINANT OFFICE OF SURFACE MINING | ) ) ) | |

## I.    INTRODUCTION

Hadi Mehrsefat (hereinafter referred to as Complainant) was an applicant for employment with the Department of the Interior (DOI), Office of Surface Mining (OSM), Office of Planning, Analysis and Budget, Washington, DC. On October 5, 2004, he made initial contact with an EEO Counselor. The EEO Counselor was unsuccessful at resolving the issues of the complaint and issued to Complainant the Notice of Final Interview and Notice of Right to File a Discrimination Complaint. Complainant received the Notice of Final Interview on November 4, 2004. Complainant filed a formal complaint of discrimination against the Agency on November 19, 2004.

The complaint was accepted for processing on January 14, 2005. An investigation was conducted during the period from January to April 2005. The completed Report of Investigation (ROI) was issued to Complainant on June 8, 2005. Thereafter, Complainant requested a final decision on the merits of his case without a hearing. The following analysis and findings represent the Final Agency Decision of the Department of the Interior.

## II.    ALLEGATIONS

Complainant alleged he had been discriminated against due to his age (date of birth March 19, 1947) and national origin (Iranian), in that he was not selected for the position of Economist, GS-0110-5/7, Vacancy Announcement Number OSM-2004-0049.

## III.    BURDENS OF PROOF – METHODOLOGY

Complainant alleged he was discriminated against on the bases of age and national Origin.

**Disparate Treatment**

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. (hereafter "Title VII") prohibits employers, including the Federal Government, from discriminating against employees or applicants for employment based upon race, color, national origin, sex or religion. In McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973), Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), and U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711 (1983), the Supreme Court delineates a tripartite burden of proof under which discrimination complaints are examined. To establish liability for disparate treatment, a complainant must first establish a *prima facie* case, that is, present facts which, if unexplained, reasonably give rise to an inference of discrimination.

With respect to the charge of age discrimination, the courts traditionally apply the same evidentiary framework for Age Discrimination in Employment Act (ADEA) cases as has evolved in the context of Title VII discrimination cases. The complainant must show that he/she is being treated less favorably than a younger employee. The ultimate burden in an age discrimination case requires the complainant to prove that age was a "determining factor" in the challenged employment decision. Cuddy v. Carmen, 694 F.2d 853, 858, n. 23 (D.C. Cir. 1982). In other words, age must make a difference in the employer's action; i.e., "but for" age discrimination, the employment decision at issue would not have occurred.

Under the above cited cases, a complainant meets his *prima facie* burden by establishing that:
1. He belongs to a protected group;
2. He was subjected to an adverse employment action by the Agency;
3. He was treated differently from other similarly situated persons outside his protected group; or that the adverse employment action was motivated by discriminatory intent.

In the absence of direct evidence, a complainant must establish a *prima facie* case of discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981); McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973). A complainant always retains the ultimate burden of persuading the trier of fact that the Agency unlawfully discriminated against him/her. Hicks, above, at 522; United States Postal Board of Governors v. Aikens, 406 U.S. 711 (1985); Furnco Construction Corp. v. Waters, 438 U.S. 567 (1978); McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273 (1976).

The courts have stated that a complainant's burden is not an onerous one and have applied it in a flexible manner. Id. Once a complainant has established these elements, the burden of production then shifts to the Agency to rebut the *prima facie* case by articulating legitimate, non-discriminatory reasons for its actions. See, Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

When the Agency has articulated a legitimate, non-discriminatory reason for its actions, the presumption of discrimination no longer applies. St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742, 2748-49 (1993). A complainant must then show that the reason given by the Agency was not the real reason for the employment decision and that the discriminatory bases claimed were the reasons for the action. Id. at 2747 (quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

Proof of discriminatory motive is critical, although it can be inferred from the fact of disparate treatment of similarly situated employees. The burden remains with the complainant to prove that the reason or reasons proffered by the Agency are pretexts for discrimination.

## IV.  DISCUSSION AND ANALYSIS

In his affidavit Complainant (age 57; Iranian) states he applied for the Economist position at both the GS-5 and GS-7 grade levels. He notes he met the qualifications as stated in the Vacancy Announcement, by his Bachelor's Degree in Banking with a major in Economics, 30 semester hours in Economics, and 32 semester hours in Statistics, Accounting, or Calculus. Complainant also notes he had a Master's Degree in Business Administration. (Exhibit 5, Page 2).

With respect to the requirement of one-year of "specialized experience," Complainant states he had two years experience as an Economist in the National Government of Iran at the Ministry of Economics and Finance as an entry-level Economist (equivalent to the Economist position for which he had applied). Complainant asserts he gained the knowledge, skills, and abilities to successfully perform the duties of the advertised position. Complainant states he had conducted planning and designing for assigned research projects, assembled data, conducted analysis and evaluations using economic tools, theories, and statistical methods leading to conclusions and report preparation. (Exhibit 5, Pages 2-3).

Complainant states he was interviewed by **Ruth Stokes**, (age 48; American), Chief, Planning, Analysis and Budget Office, and **Nancy Broderick**, (age 53; American), Senior Economist. Ms. Stokes asked Complainant to summarize his education and work history. Complainant responded by saying he had a Master's Degree in Business Administration, and a Bachelor's Degree with 30 semester hours in Economics and 32 semester hours in Accounting, Mathematics, and Statistics. Complainant explained he was an entry-level Economist in the Iranian Government. He told them when he came to the United States he started his own businesses, a restaurant, a car dealership, and later, in 1998, a business and investment consulting firm where he provided business and investment advice to clients. Complainant told them in 1998 he started teaching Economics, Business, and Finance courses at Strayer University, and also taught graduate-level courses at Southeastern University. (Exhibit 5, Pages 4-5).

3

Other questions asked of Complainant during the interview included a question regarding his analytical skills. Complainant states his answer was "sufficiently comprehensive," (contrary to what they told the EEO Counselor). Complainant told them he had been teaching Economics, Business, and Finance courses for more than 6 years both at the undergraduate and graduate levels, and as part of his job he was always involved in problem solving and case studies related to Economics and business problems and issues. Complainant also notes in a previous job as a business and investment consultant, he analyzed data like GDP growth rate, changes in CPI, average weekly initial claims for unemployment insurance, manufacturer's new orders, money supply, interest rate spread, index of consumer expectations, and other economic indicators, so as to determine different business and economic conditions. Complainant also mentions he had provided fundamental analysis, financial statement and ratio analysis, and technical analysis of corporations for the purpose of investment in corporate securities. (Exhibit 5, Page 5).

A question asked of Complainant during the interview was about his hands-on computer ability. Complainant told them it was not limited to grading his students' papers and exams as was stated in the Counselor's Report. Complainant asserts he told them that for the purpose of analysis and in his day-to-day work he uses Word, Excel, Access, accounting software, and other commonly used software. Complainant also informed them in his research he uses a variety of online databases and other Internet resources. (Exhibit 5, pages 5-6).

A question asked of Complainant during the interview was about how he would do data estimation methodology and projecting a fourth quarter of data if only three quarters of data were available. Complainant responds that different methods could be used, including obtaining expert opinion, business executives' opinions, consulting economic indicators, and using statistical methods. Complainant also told them a comparison of the past trend for the last three quarters could be used to determine the future estimate. Complainant also told them a comparison could be done of the last three quarters of forecasting data with the actual data to determine if there was an overestimation or underestimation of the prediction. Complainant notes this method was "quite a popular method of forecasting." (Exhibit 5, Page 6).

Complainant states he was informed he had not been selected for the position via an e-mail message sent to him on August 27, 2004. (Exhibit 5, Page 6).

In response to the question of what supports his claim of national origin discrimination, Complainant asserts the Iranian hostage crisis of 1980-81 fostered a very negative impression of Iranians among Americans. Complainant further asserts that after September 11, 2001, many Americans have remained angry and upset with Muslims and people from the Middle East, and have very unfavorable views towards them. Complainant stated he felt Ms. Stokes and Ms. Broderick had such negative feelings. Complainant also noted when studying human relations one finds people stereotype other people. (Exhibit 5, Pages 6-7).

4

In response to the question of what supports his claim of age-based discrimination, Complainant states there is a "great deal" of research that "organizations tend to hire younger people because they think older employees are less productive and less flexible than younger employees and can serve for a shorter period of time. Therefore, economically it is not in the benefit of the organizations to hire them." Complainant also states at the end of his interview Ms. Stokes and Ms. Broderick told him they mostly needed someone to do data entry, and they pretended the position would be a low-level job for him. Complainant states he told Ms. Stokes and Ms. Broderick he would do data entry and anything else the job required. Complainant also states he was told by the EEO Counselor that the selectee was mostly doing data entry duties. (Exhibit 5, Pages 7-9).

When asked by the investigator if he was qualified to do data entry, Complainant responded he was, noting he had the knowledge, skills, and abilities to perform data entry as well as other duties of the advertised position. (Exhibit 5, Page 9).

In her affidavit **Ruth Ellen Stokes,** Chief, Planning, Analysis and Budget Office, GS-15, states she was the selecting official for the Economist position for which Complainant had applied. Ms. Stokes notes the selectee for the position would be working directly for her. (Exhibit 6, Pages 1-2).

Ms. Stokes states she interviewed a total of 13 applicants for the position: 4 from the GS-5 list, 6 from the GS-7 list, and 3 from the GS-9 list. Ms. Stokes noted Complainant had applied for the GS 5/7 position, but his name was only on the GS-5 certification list. The out-of-town applicants were interviewed by phone. The local applicants were given a choice of either an in-person interview or a telephone interview. (Exhibit 6, Pages 2-3).

Ms. Stokes states she took notes of the interview sessions, and used them as a supplement to the application. Ms. Stokes adds each applicant was asked two problem solving questions applicable to the type of work they would be doing. Ms. Stokes states this was helpful in seeing how the applicant would apply economic concepts to a situation. Ms. Stokes states she referred to her notes to refresh her memory of the applicants' responses during the interviews. (Exhibit 6, Page 3).

In response to the question of what she was looking for in a candidate for the GS-5 position, Ms. Stokes states it was an entry-level position with the potential for progression to a GS-12 level. She was looking for "someone who had the basic skills to do the job and would grow in the position. The position at this level required someone who would be working directly with a Senior Economist and assisting in components of pulling together data for various analyses and studies. The initial work would involve collecting detailed information from internal sources and assisting in statistical validation activities. The Senior Economist (Ms. Broderick) would be mentoring and training the individual selected." (Exhibit 6, Pages 3-4).

In response to the question of what criteria she used to determine who to select Ms. Stokes states "educational requirements, skills to collect and analyze data, ability to

5

apply economic principles to (the) work, and a person's ability to grow in the position. Also, it was important to have someone who had basic skills to organize the data in electronic format for analysis work." (Exhibit 6, Page 4).

In response to the question of what she meant by "ability to grow in the position," Ms. Stokes states, "a person who basically would take direction and see this as a learning process to further develop (their) skills and see it as a career. Someone doing hands-on, detailed work of gathering data as the basis for further economic analysis." (Exhibit 6, Page 4).

In comparing Complainant to the selectee, James C. Tichenor (age 25; American), Ms. Stokes states they had both met the educational requirements. Mr. Tichenor had demonstrated ability in data collection and methodology, recent database management experience to organize data, and current computer applications that would enable analysis of data. Mr. Tichenor demonstrated knowledge of economic concepts, conducted surveys and completed grant proposals outlining steps and goals. Ms. Stokes stated "his skills would be at the entry level." (Exhibit 6, Page 4).

With regard to her analysis of Complainant, Ms. Stokes states he was a current professor at Strayer University and taught Economics. She did not recall him relating database information other than in grading student papers. His experience was very accomplished, but not related to data collection and database management skills at an entry level. (Exhibit 6, Page 4).

Ms. Stokes stated Complainant was not selected because he was not the best qualified for the GS-5 position. Ms. Stokes stated Mr. Tichenor was selected because he had the skills set at the appropriate level. (Exhibit 6, Page 5)

Ms. Stokes felt the Vacancy Announcement properly described the duties of the position. (Exhibit 6, Page 5).

In her affidavit **Nancy Robertson Broderick**, Senior Economist, GS-14, states she sat in on the interviews conducted for the Economist position, and asked two questions related to quantitative data analysis. (Exhibit 7, Pages 1-2).

In response to the question of what she was looking for in a candidate, Ms. Broderick stated "a person who could do problem solving. Someone, who upon being given a problem, could, through an intelligent process, determine how to solve it quantitatively. The person must have experience in cost benefit analysis and hands on computer skills." (Exhibit 7, Page 3).

Ms. Broderick maintains Complainant's responses to questions were vague. He gave an extensive explanation about leaving Iran, after arriving in the United States spent the next 20 years opening a car dealership and restaurant, and then eventually teaching school. All of that was general in nature. With regard to his abilities, Ms. Broderick states Complainant offered a stack of his student evaluations for Ms. Stokes to read;

6

Ms. Broderick notes she declined. Ms. Broderick states the student evaluations and Complainant's answers were not pertinent to the questions asked. (Exhibit 7, Page 4).

Ms. Broderick disagreed with Complainant's assertion his work experience was related to the position for which he applied. She states he did not have enough experience with data manipulation or hands on computer skills experience. She considered his experience and education more related to Finance and Business Management. Ms. Broderick states Complainant had more business skills than economic cost benefit analysis skills. Ms. Broderick's recollection was when asked about computer skills, Complainant mentioned logging on the computer to do his students' grades. (Exhibit 7, page 4).

Ms. Broderick states she was on annual leave the day of Mr. Tichenor's interview, and thus, she was not present. Ms. Stokes told her about his qualifications and experience. (Exhibit 7, Page 4).

Ms. Broderick states Ms. Stokes asked for her opinion and she felt Mr. Tichenor was the best qualified. (Exhibit 7, Page 3). She confirms the Vacancy Announcement for the position adequately described the qualifications sought for the position. (Exhibit 7, Page 4).

Complainant insists his answers to the questions asked by Ms. Stokes and Ms. Broderick were not general and vague as they had told the EEO Counselor. Complainant notes at the end of his interview with Ms. Stokes and Ms. Broderick, he expected them to ask him more questions, especially if his answers were not clear, but they did not. (Exhibit 5, Page 9).

In his rebuttal statement Complainant noted he scored highest of all the applicants with a score of 97.48, whereas Mr. Tichenor scored 96.34. (Exhibit 5-1, Page 1).

In his rebuttal statement Complainant notes Mr. Tichenor's work experience was not in Economics. Complainant contends Mr. Tichenor's experience did not come close to his extensive record as an Economist, as a business owner, and as a professor. Complainant also asserts his education was far more extensive than Mr. Tichenor's. Complainant notes he had more Economics and Economics-related courses. Complainant also notes he has a Master's degree, while Mr. Tichenor does not. (Exhibit 5-1, Pages 1-2)

In his rebuttal statement Complainant quoted Ms. Stokes as saying she was seeking an entry-level person not knowing a lot, and who would be trained by the Senior Economist. Complainant asserts Ms. Stokes discarded the significance of experience and qualifications as specified in the Vacancy Announcement, thus finding Mr. Tichenor better qualified on the grounds he was less experienced, "i.e. a lot younger." (Exhibit 5-1, Page 2).

In his rebuttal statement Complainant notes when Ms. Stokes was asked what criteria led her to regard Mr. Tichenor as better qualified, she stated Mr. Tichenor "did not have a

7

whole lot of experience and would be at the entry level," and Complainant "was already above the level of what (they) were looking for." (Exhibit 5-1, Page 2).

In his rebuttal statement Complainant notes when Ms. Broderick was asked to summarize why Mr. Tichenor was selected, she states she "thought he was the best qualified and Ms. Stokes had asked for her opinion." Complainant notes when she was asked what criteria she used to determine Mr. Tichenor was the best qualified, Ms. Broderick states she "was not aware of his qualifications. (She) was not in the office at the time he came in for (his) interview. Since (she) did not personally participate in the interview, Ms. Stokes related (to her) his qualifications and experience." (Exhibit 5-1, Page 3).

In his rebuttal, Complainant describes as pretext the statements made by Ms. Broderick that his answers were vague and he did not have enough hands on computer skills, and the statements made by Ms. Stokes that she did not recall Complainant relating database information. Complainant asserts his experience in the areas of the job's requirements was clearly stated and available from the information he submitted as part of his application package. (Exhibit 5-1, Pages 3-4).

The problem solving questions asked of the interviewees were 1) regarding the Coal industry, and 2) data estimation methodology. (Exhibit 6-1, Page 2).

Vacancy Announcement Number OSM-2004-0049 for the position of Economist, GS-0110-05/07, opened on April 30, 2004, and closed on June 1, 2004. The Vacancy Announcement noted the position was concurrently advertised at the GS-09/11 grade level. (Exhibit 8, Page 1).

In the section entitled "Statement of Duties," it was stated, in relevant part, "...As a trainee, incumbent will work directly with Senior economist and analysts assisting in initiating, formulating, executing, and coordinating economic analyses and cost/benefit studies, statistical studies, forecasts, assessments and evaluation of matters related to the surface coal mining industry, State regulatory authorities and the environment. Develops specific detailed plans for studies required for short-term and long range projects. Assists in the preparation of written reports. Collects detailed information from internal sources, such as: Federal and (S)tate inspection data, and from industry and other agencies such as the Energy Information Administration's (EIA) Annual Coal Report. Analyze and interpret factual economic statistics, such as: (S)tate Annual Reports, and other Federal agencies. Analyzes economic and statistical information requirements to develop program or administrative reporting systems. Assists in data gathering and statistical validation activities needed to support results contained in evaluation reports. Prepares and organizes materials by preparing briefing papers, narrative descriptions, memoranda, graphs, charts, statistical analyses, etc., for presentation or publication in support of evaluations and studies conducted. May assist team members on task forces and/or projects often involving other agency personnel. Maintains close contact with other agency officials on a variety of complex and interrelated program matters." (Exhibit 8, Pages 1-2).

In the Vacancy Announcement, basic requirements for the position at the GS-5 level were: a bachelor's degree with a major in Economics, that included at least 21 semester hours in Economics and 3 semester hours in Statistics, Accounting, or Calculus, or a combination of education and experience (i.e., courses equivalent to a major in Economics, plus appropriate experience or additional education). (Exhibit 8, Page 2).

Through the "QuickHire" system, all applicants for the position were asked to respond to 17 closed-ended questions (i.e., their response to each question had to be one of the provided responses). Applicants to the GS-5 grade level were asked two additional questions regarding their education and experience. Applicants to the GS-7 level were asked to demonstrate, by picking one of the supplied responses, how they met the extra requirement for being selected at that grade level. (Exhibit 8, Pages 6-11).

In the position description at the GS-5 grade level, under the section entitled "Factor 1 – Knowledge Required by the Position," it is stated, "Knowledge of automated database systems and databases, and techniques in order to develop, modify, and convert information for presentations, reports, analysis, etc., and make recommendations for establishing/modifying database systems for data collection efforts." It is also stated, "Ability to prepare spreadsheets and use various computer software such as Word, Access, Excel, PowerPoint, etc." (Exhibit 9, Pages 3-4).

A copy of the "Screening Sheet" for the position at the GS-5 level showed five individuals made the "cut-off" score of 95.00: Complainant (97.48), Matthew Brigida (96.72), Jonathan Hibshman (96.34), Mr. Tichenor (96.34), and Ajani Pierce (95.08). (Exhibit 14, Page 1).

A copy of the "List of Eligibles" for the position at the GS-5 level that was issued on June 23, 2004, included a notation that Mr. Brigida (date of birth December 17, 1977; American) had been offered the position, but declined it on July 28, 2004. Another notation showed Mr. Tichenor accepted the offer on or about August 17, 2004. (Exhibit 15, Page 3).

A review of Ms. Stokes's interview notes show Mr. Brigida and Mr. Hibshman to have been interviewed on July 8, 2004. Complainant was interviewed in-person on July 9, 2004. Mr. Tichenor was interviewed on July 29, 2004, one day after Mr. Brigida declined the offer. (Exhibit 6-1, Pages 3-10).

A copy of the "List of Eligibles" for the position at the GS-7 level that was issued on June 23, 2004, included notation that John Powers had been offered the position, but declined it on August 10, 2004. Jennifer Sohns had been offered the position, but declined it on August 11, 2004. (Exhibit 15, Page 9).

Complainant's submitted application materials noted, among other things, the following: while a working as an adjunct faculty member at Strayer University, he taught principles of management, Organization Behavior, Financial Management, and Economics courses; as a Securities Analyst he reviewed, examined, and analyzed financial situations of public

corporations for investment, did fundamental analysis of financial statements including income statements and balance sheets, financial ratio analysis including return on assets, return on equity, profit margin, liquidity ratios, and debt and asset management ratios, technical analysis of stocks of corporations, and evaluation of economic indicators to predict future trends of the market; as the Owner/Manager of Central Auto, Inc., he prepared a business plan, budgets, financial statements, developed inventory control system, evaluated customer credit history, hired and supervised staff; as an Economist, he performed research on economic policies and government programs, developed and adapted economics theory and methodology, edited data, and prepared sector plans for five-year economic development. (Exhibit 16, Pages 5-8).

There is no specific mention in the materials submitted by Complainant with regard to his knowledge and experience working with computers and computerized database management systems. (Exhibit 16).

Mr. Tichenor's submitted application materials noted, among other things, the following: while a volunteer with the Peace Corps in Ukraine he created a database using Microsoft Access to compile and analyze the results of a health survey distributed to youth; while working as an intern with the IRS he designed and maintained an employees' internal intranet website; he described himself as "proficient" in Microsoft Word, Excel, Access, and FrontPage software. (Exhibit 17, Pages 5-7).

Mr. Brigida's submitted application materials noted, among other things, the following: he had used software including Oracle Financials, Excel, Business Objects, SQL Navigator 3, Passport 6.1, ADI, CLIME, Visual Basic, Microsoft Office, and SHAZAM and SAS statistical software. (Exhibit 18, Pages 13-15).

A review of Ms. Stokes's notes for Matthew Brigida, the initial selectee who later declined the position, included a notation he had skill in Excel and Access. (Exhibit 6-1, Pages 3-4).

A review of Ms. Stokes's notes for Complainant had no specific notation regarding computer or database management. (Exhibit 6-1, Pages 7-8).

A review of Ms. Stokes's notes for Mr. Tichenor included a notation that, while working for the Peace Corps, he had created a website to allow individuals to see the work being done, and to share that information. (Exhibit 6-1, Pages 9-10).

A review of the position description at the GS-5 and GS-7 grade levels shows the incumbent at the GS-5 grade level assisted on certain duties such as preparing reports, assisted in analyzing economic and statistical information, and assisted in data gathering, whereas the incumbent at the GS-7 grade level was actually tasked with preparing reports, analyzing information, and gathering data. (Exhibits 8 and 9).

*Prima facie analysis*

Complainant can establish he is a member of a protected class by virtue of his age (57 at the time of the allegedly discriminatory event) and his national origin (Iranian). Complainant can establish there was a job vacancy, he applied for the vacancy, and he was qualified for the position. He can also establish a younger individual (Mr. Tichenor) not within the protected age group, and not of his national origin, was selected for the position. Thus, Complainant has established his *prima facie* case of age-based and national origin-based disparate treatment discrimination.

Once Complainant meets his burden by establishing a *prima facie* case of discrimination, the burden then shifts to the Agency to provide a legitimate, non-discriminatory reason as to why it did not select him for the position in question. In the particular case the evidence shows the position was actually offered to three other individuals prior to it being offered to, and accepted by, the ultimate selectee Mr. Tichenor. Thus, it would appear at first glance that an analysis of the Agency's actions would need to review why all four of these individuals were "selected" for the position. However, two of the individuals, Mr. Powers and Ms. Sohns, were offered the position at the GS-7 grade level. Complainant was only rated qualified at the GS-5 grade level and, therefore, had he been selected he would have only been offered the position at the GS-5 level. Since the evidence showed the duties of the position to be different at the GS-5 and GS-7 levels, analysis of the Agency's actions will focus only on the offers made at the GS-5 grade level to Mr. Brigida (who declined the position) and Mr. Tichenor (who was accepted and was ultimately selected).

The investigative record is limited regarding why Mr. Brigida, on or about July 28, 2004, was the first individual to be offered the position. Specific questions regarding Mr. Brigida were asked of neither Ms. Stokes nor Ms. Broderick, the two individuals involved with making the selection decisions. The record did show Mr. Brigida to have been ranked second on the GS-5 grade level "List of Eligibles" with a score of 96.72, behind only Complainant who had a score of 97.48, and ahead of Mr. Tichenor who ranked third with a score of 96.34. (Exhibit 15, Page 3)

A review of the application materials submitted by Mr. Brigida showed him to claim experience in numerous software packages (Exhibit 18, Pages 13-15). This information is relevant because when responding to the question of why Mr. Tichenor was selected instead of Complainant, Ms. Stokes pointed to his "demonstrated ability in data collection and methodology, recent database management experience to organize data, and current computer applications that would enable analysis of data." (Exhibit 6, Page 4). Thus, the evidence showed Mr. Brigida to have this same desirous knowledge of computers and data management.

With respect to Complainant's candidacy for the position, Ms. Stokes testified she did not recall him relating any experience working with databases, other than in grading student papers. A review of Ms. Stokes's notes shows no notation that Complainant mentioned experience with computers or data management. (Exhibit 6-1, Pages 7 & 8). Also,

11

Ms. Broderick testified that Complainant did not have, or at least discuss, experience working with data and computers. (Exhibit 7, Page 4). Also, a review of the application materials submitted by Complainant showed no mention of experience working with any software packages, or otherwise working with computerized databases. (Exhibit 16).

Further analysis regarding Mr. Tichenor's knowledge of computers and databases included his application materials in which he noted he had created a database while working with the Peace Corps, and that he described himself as "proficient" in Microsoft Excel and Access. (Exhibit 17).

In situations such as the case at hand, management filled one position. Complainant was among those qualified. He was referred for consideration and subsequently interviewed by the selecting official. However, he was not selected. The EEOC has noted that an agency has the discretion to choose among equally qualified candidates so long as the decision is not based on unlawful factors such as age or any other discriminatory *animus*. See Wrenn v. Gould, 808 F.2d 493, 502 (6th Cir. 1987); Abood v. Agency for International Development, EEOC Appeal No. 01943526 (August 31, 1995). Court and EEOC precedent have consistently held that when there are qualified candidates competing for the same position, the selecting official may exercise his/her prerogative in choosing between the candidates and, absent discrimination, a trier of fact should not substitute his judgment for the legitimate exercise of managerial discretion. Bauer v. Bailar, 647 F.2d 1037, 1048 (10th Cir. 1981); Jenkins v. Department of Interior, EEOC Request No. 05940284 (March 3, 1995); Shapiro v. Social Security Administration, EEOC Request No. 05960403 (December 6, 1996). Although Complainant may have had more work experience, both he and the selectees (Mr. Brigida and Mr. Tichenor) were qualified for the GS-5 grade level position at issue in this complaint.

Thus, the Agency has established its legitimate, non-discriminatory reason as to why Mr. Tichenor, and Mr. Brigida, were both selected instead of Complainant for the GS-5 grade level Economist position. The burden now shifts back to Complainant to show the Agency's purported reasons for its actions to be pretext for discrimination.

Complainant offers as evidence of pretext his superior experience and education as compared to Mr. Tichenor. Complainant noted his "extensive record" as an Economist, professor, and private business owner, including the fact he has a Master's degree whereas Mr. Tichenor does not. Complainant also disagreed with the assertion made by Ms. Stokes and Ms. Broderick that his answers to their questions during the interview were vague, and that he did not have enough hands-on computer skills. Complainant stated his experience with regard to the job requirements was clearly stated and available in the information he submitted as part of his application package. He contends, if his answers were vague or otherwise unresponsive to the questions they had asked him, they should have asked him more questions. (Exhibit 5-1, Pages 1-2). Complainant, in his affidavit, also asserts he told Ms. Stokes and Ms. Broderick he used Word, Excel, Access, accounting software and other software in his day-to-day work, as well as a variety of on-line databases and other Internet resources. (Exhibit 5, Pages 5-6).

Reviewing Complainant's assertions, however, does not support a finding that the Agency's reasons are pretext for discrimination. As already stated, the Agency established Mr. Brigida and Mr. Tichenor as qualified for the position at the GS-5 grade level. Complainant's assertions do nothing to disprove this fact. While Complainant can point to more work experience, it is not established that all this experience is necessarily relevant to the position at issue; in fact, Ms. Stokes and Ms. Broderick both raised this point, that Complainant was accomplished, but his experience did not apply to what to the duties of advertised position. Additionally, Complainant's work experience does not necessarily indicate he is better qualified than the two individuals offered the position. While Complainant contends he did, in fact, have the knowledge and experience working with computers and database management purported to be desired by the Agency, there is not, in fact, any evidence to show this was conveyed to the Agency. Neither of the two individuals with whom he interviewed stated he told them he had this knowledge and experience, nor is there any specific mention of this knowledge contained in the materials he submitted as part of his application. Complainant contends this information was readily available to the Agency, but there is no evidence to support this contention.

In his affidavit, Complainant indicated he felt his non-selection was a case of National Origin-based discrimination by referencing the 1980-81 Iranian hostage crisis which fostered a negative impression of Iranians among Americans, and the September 11th attacks which left many Americans angry, upset, and with a negative view towards Muslims and people of the Middle East. Complainant felt Ms. Stokes and Ms. Broderick had those feelings. He also indicated he felt his non-selection was a case of age-based discrimination by referencing research showing that organizations tend to hire younger people because they think older employees are less productive and less flexible than younger employees, and they will only work for a shorter period of time.

These last two statements do not advance Complainant's claims of pretext. Complainant's assertion is because of anti-Iranian/Middle Eastern and age stereotypes he was not selected for the position. However, Complainant has no evidence to support his contention that either of the individuals involved in making the selections hold these views. He merely relies on stereotyping Ms. Stokes and Ms. Broderick as the type of individual who would engage in such behavior. This is not sufficient to show pretext in their explanation of their actions.

Two additional pieces of information as noted by Complainant are, Mr. Tichenor was not interviewed until after Mr. Brigida declined the position, and two individuals were offered the position at the GS-7 grade level prior to Mr. Tichenor's ultimate selection. This information, does not reveal any inconsistency with the Agency's stated legitimate, non-discriminatory reasons as to why Complainant was not selected for the position.

## V. FINDINGS AND CONCLUSIONS

Based on the above analysis of the record evidence, it is the decision of the Department of the Interior that the complainant, Hadi Mehrsefat, was not subjected to unlawful

13

discrimination as alleged in this complaint. No corrective action or attorney fees are warranted. This is the final Agency decision of the Department of the Interior.

**APPEAL RIGHTS TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Title 29 C.F.R. Section 1614.402(a) provides that an appeal of the Agency's final order to the Commission must be filed by an appellant within thirty (30) calendar days of receipt of an Agency's or Administrative Judge's dismissal, final action or final decision. If the complainant is represented by an attorney of record, the 30-day time limit shall begin to run from the date of receipt by the attorney of the notice of dismissal, final action, or final decision without a hearing. All such appeals must be filed with the Commission at the following address:

>  Equal Employment Opportunity Commission
>  Office of Federal Operations
>  Post Office Box 19848
>  Washington, D.C. 20036

As an alternative to mailing, appeals may be hand-delivered to:

>  Equal Employment Opportunity Commission
>  Office of Federal Operations
>  1801 L Street, NW
>  Washington, D.C. 20507

As a further alternative, appeals may be sent by fax to:

>  (202) 663-7022

The appellant shall furnish a copy of the appeal to the Agency at the same time it is filed with the Commission. In or attached to the appeal to the Commission, the appellant must certify the date and method by which service was made on the opposing party. The individual appellant should use EEOC Form 573, Notice of Appeal/Petition (copy enclosed).

CIVIL ACTIONS

In lieu of an appeal to the Commission, you may file a civil action in an appropriate United States District Court within 90 calendar days of receipt of the final decision.

If you file an appeal with the Commission, and you are not satisfied with the Commission's decision, you may file a civil action in an appropriate United States District Court within 90 calendar days of receipt of the Commission's final decision.

You may also file a civil action any time after 180 calendar days from the date of filing an appeal with the Commission, if there has been no final decision by the Commission.

Upon your request, the Civil Rights Act and the Rehabilitation Act give the Court discretionary authority to appoint an attorney without payment of fees or costs by you. The grant or denial of your request is within the sole discretion of the Court. Your request and the civil action must be filed within 90 days of the date the final decision is received. Please note that the Age Discrimination in Employment Act contains no specific provision for a court-appointed attorney. If you file a civil action involving this complaint, **you must specifically name the Secretary of the Department of the Interior, Gale Norton, as the defendant.** Failure to do so may result in the loss of any judicial redress to which you may be entitled.

It is important to note that 29 C.F.R. Section 1614.409, states "Filing of a civil action under 1614.408 or 1614.409 shall terminate Commission processing of the appeal. If private suit is filed subsequent to the filing of an appeal, the parties are requested to notify the Commission in writing."

_____
Sharon D. Eller
Director, Office of Civil Rights
Office of the Secretary

8 August 2005
Date

Enclosure - EEOC Appeal Form 573

cc: James E. Joiner, Equal Opportunity Officer, Office of Surface Mining

15